[Cite as *State v. Elam*, 2016-Ohio-5619.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103122**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## CHARLES ELAM

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-14-587865-A

**BEFORE:** Laster Mays, J., Jones, A.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** September 1, 2016

-i-

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
820 West Superior Avenue, Suite 800
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy McGinty
Cuyahoga County Prosecutor

By:   Jennifer King
John Patrick Colan
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

## I. INTRODUCTION AND BACKGROUND

{¶1}   Defendant-appellant Charles Elam ("Elam") appeals from his bench trial convictions for two counts of gross sexual imposition and one count of kidnapping with a sexual motivation specification.   Elam was sentenced to a prison term of 15 years to life.  After review of the record, we affirm the conviction.

{¶2}   The victims were three female relatives, all under the age of 16 at the time of the offenses:   R.B., d.o.b. 1/1/02, her sister Ch.S., d.o.b. 12/6/03, and their aunt, C.C.S., d.o.b. 12/6/81.   Elam was indicted on September 5, 2014 on nine criminal counts.

{¶3}    As to R.B., Elam was indicted for the following:

(1)  Count 1:  2008, rape of a victim under the age of 10 pursuant to R.C. 2907.02(A)(1)(b);

(2)  Count 2:  2008, kidnapping of a victim under the age of 13 for purposes of engaging in sexual activity pursuant to R.C. 2905.01(A)(4);

(3)  Count 3:  2008 disseminating matter harmful to juveniles pursuant to R.C. 2907.31(A)(1);

(4) Count 4:  2009 - 2013, gross sexual imposition of a victim under the age of 13 years pursuant to R.C. 2907.05(A)(4);

(5) Count 5:  2009 - 2013, disseminating matter harmful to juveniles pursuant to R.C. 2907.31(A)(1); and

(6) Count 6, 2013: gross sexual imposition of victim under the age of 13 years pursuant to R.C. 2907.05(A)(4).

**{¶4}** As to Ch.S., Elam was indicted for the following:

(7) Count 7: 2008 - 2009, gross sexual imposition of victim under the age of 13 years pursuant to R.C. 2907.05(A)(4); and

(8) Count 8: 2008 - 2009, gross sexual imposition of victim under the age

of 13 years pursuant to R.C. 2907.05(A)(4).

**{¶5}** As to C.C.S., Elam was indicted for the following:

(9) Count 9: 1997, gross sexual imposition of victim at the age of 15 years pursuant to R.C. 2907.05(A)(1).

**{¶6}** Counts 1 through 9, included sexually violent predator specifications pursuant to R.C. 2941.148(A), and one count included a sexual motivation specification under R.C. 2941.147(A).

**{¶7}** After dismissals of Counts 3, 4, 5, 6, and 8, the trial court was left with Counts 1, 2, 7, and 9. Elam was found not guilty of Count 7, gross sexual imposition under R.C. 2907.05(A)(4), relating to Ch.S., and not guilty of the sexually violent predator specifications on the remaining counts. Elam was convicted on Count 1 of the lesser included offense of gross sexual imposition under R.C. 2907.05(A)(4), a third-degree felony, and Count 2, kidnapping, a first-degree felony under R.C. 2905.01(A)(4), with a sexual motivation specification, both as to R.B. Elam was also convicted on Count 9, gross sexual imposition, R.C. 2907.05(A)(1), as to C.C.S.

**{¶8}** At sentencing, Counts 1 and 2 merged, and the state elected to proceed on Count 2, kidnapping. Count 2 was sentenced under the Adam Walsh Act with imprisonment of 15 years to life. Elam was also classified as a Tier III offender subject to a lifetime sex offender registration every 90 days. On Count 9, Elam received a concurrent 18-month prison term, plus a mandatory five years of postrelease control.

## II. FACTS

**{¶9}** Elam is the first cousin of T.S., the grandmother of victims R.B. and Ch.S. ("Grandmother"), who testified first in the case. She is also the mother of victim C.C.S. and has several adult children including daughters S.S., Ro.S., T.B. and son J.S. S.S. is the mother of victims R.B. and Ch.S.

**{¶10}** Grandmother's late mother, Anna, owned houses on East 110th, 113th, and 112th Streets in the Union area. Elam has resided in the second floor unit of the East 110th Street address since 1990. The family often gathered at the East 112th Street location, and Elam was usually present, often playing with the children. Elam attended a birthday party for Grandmother on January 11, 1997, at the East 112th Street address where daughter Ro.S. resided.

**{¶11}** Victim C.C.S. testified that she remembers the 1997 incident as the day "when I was almost sexually assaulted." C.C.S. stated that after the party, she was alone in the house with her cousin, sister Ro.B., brother J.S., and Elam between 11:00 p.m. to midnight. C.C.S. fell asleep on the couch fully dressed, but "woke up startled," with her shirt pulled up, exposing her bra. Elam was licking her below her naval, above the

pubic area. Her pants were unzipped and underwear exposed. C.C.S. recalled Elam's brief laugh as she pushed Elam off of her, jumped up, and ran into the next room to get into bed with her cousin. C.C.S. did not give Elam permission to touch her and did not want him to. She did not recall seeing Elam expose his genitals.

{¶12} C.C.S. told her cousin, sister Ro.S., and Grandmother what had transpired. C.C.S. testified that Grandmother telephoned Elam who could not recall anything except walking home after the party. The other adults who attended the party said that Elam had been drinking heavily and that he did not mean to do anything wrong. C.C.S. believed Elam's intent was to perform oral sex. C.C.S. never discussed the 1997 incident with nieces R.B. or Ch.S. until 2014, after the nieces reported sexual behavior by Elam.

{¶13} In 2008, for approximately one year, C.C.S. resided with her sister T.B. on the first floor of the East 110th house. Elam resided in the second floor unit. Several times during that period, C.C.S. babysat for R.B. and Ch.S. She told S.S. to stop asking Elam to babysit the girls and warned her not to have other children around Elam because he was always around the children at family functions. Also in 2008, C.C.S. had a discussion with someone who told her that Elam often threw teen parties and knew a number of teenaged girls. The person told her that Elam bragged about his interest in oral sex. C.C.S. testified that she saw Elam at various family functions after the 1997 party but never talked with him.

{¶14} During the winter of 2014, C.C.S.'s sister, T.B. contacted C.C.S. to tell her that T.B.'s daughter was exhibiting sexual behaviors. The daughter said she learned the behavior from cousins R.B. and Ch.S. C.C.S. telephoned her nieces and "went down the list of people who I knew they had been around. It was about five people, and they denied the first five, so when I asked them about Charles [Elam], did he do anything to them, my niece [R.B.] hesitated." R.B. confirmed that the behavior was learned from Elam. R.B. also told C.C.S. that Elam had kissed her on the mouth.

{¶15} The next day, C.C.S. contacted the Cleveland Police Department's Sex Crimes Unit, informed them that she believed Elam had been molesting her nieces, and that Elam attempted to sexually assault her when she was 15. The officer informed her that it was not too late to file a report. C.C.S. filed her sexual assault report at the Fourth District Police Station. She subsequently accompanied her sister S.S. and nieces R.B. and Ch.S. to make their police report. C.C.S. did not file charges against Elam to retaliate.

{¶16} J.S. testified that he was 14 years old at the time of the 1997 incident. He was dozing on the couch just a few feet away from the chaise where his sister C.C.S. was sleeping during the 1997 incident and observed:

> [C.C.S.] was, well, she was laying down like she was sprawled out like this with her arms up, and her shirt was like kind of like raised to her belly button, and I saw [Elam] like sit down and put his foot on the lounge chair, then he just rolled her shirt up to like her breast part, and he startled like kissing all the way down to her waist to her pants, and then she like woke up startled, and then she like did a move on him like a push. * * * He just got up and like drowsy and walked out the patio door, the porch door, sliding doors.

**{¶17}** J.S. thought that Elam was drunk but was shocked at what he observed. J.S. never told anyone and first discussed the incident with C.C.S. after the police got involved.

**{¶18}** Grandmother testified that in 1997, after the party, C.C.S. told her "what [Elam] did." Grandmother stated that she never confronted Elam as others told her that Elam had been drinking, and she found it difficult to believe that Elam would do something like that to C.C.S. Grandmother does not think C.C.S. has ever gotten over it. Grandmother was not sure which family members knew of the 1997 incident but, at some point, her son J.S. told her that he had witnessed it.

**{¶19}** Victim R.B. testified that she and her sister Ch.S. visited the East 110th house where Elam, her aunts C.C.S. and T.B., and T.B.'s young daughter resided. Elam would give the girls coffee and candy and take them to the store. R.B. "snuck" up to Elam's unit to get coffee and candy during one visit. There were naked girls and guys dancing on the television that R.B. described as "porn." Elam was drinking a lot, and there were a lot of beer cans. R.B. ate candy, went into the bedroom where she fell asleep, and awakened to find her pants down and a red-eyed Elam licking her vagina. Elam was not in the bedroom when R.B. watched televison and fell asleep.

**{¶20}** Elam grabbed R.B.'s arm and told her not to tell anyone when she stood up to go downstairs to her aunt's unit. R.B. could not recall what else was said. R.B. went directly downstairs as her mother had arrived to pick her up. R.B. did not tell anyone about it because she was embarrassed, but just recently told her mother and her

aunt C.C.S.   At that time,   C.C.S. told R.B.   what Elam did to her when she was younger.

{¶21}   Victim Ch.S. also testified about visits to the East 110th home and that Elam would let R.B., Ch.S. and their cousin have coffee and candy.   During one visit, Ch.S. sat on Elam's lap and she felt something hard when he moved around.   During another visit, R.B. and Ch.S. had to use the restroom.   Elam told them to go together, he then entered after they exited, and then showed them his penis.   Ch.S. did not tell anyone about these experiences until she spoke with people at the hospital and police station. On cross-examination, Ch.S. denied telling the police that she felt something hard when sitting on Elam's lap.

{¶22}   T.B. testified that she lived at the house on East 110th from 2007 to 2009, and that her nieces R.B. and Ch.S. came to the house frequently for babysitting and visits.   On one occasion, T.B. called the name of R.B., who exited Elam's bedroom followed by Elam.   Elam said he was making coffee for R.B., but no coffee was made.

{¶23}   Several years later, T.B. was living in Virginia Beach. T.B. discovered her 7-year-old daughter in bed with a little boy who T.B. was babysitting.   The covers were pulled over them and her daughter was on top of the boy. The daughter said she learned the behavior from cousins, R.B. and Ch.S.   T.B. telephoned her sisters S.S. and C.C.S., advised them of the situation, and requested that they speak with R.B. and Ch.S.

{¶24}   S.S. testified that she has four children.   Daughters R.B. and Ch.S. are the oldest, and they have two younger brothers.   S.S. resided in Rocky River from 2006

to 2009. R.B. and Ch.S. visited T.B.'s home at East 110th often. They frequently spent the night on weekends and during the summer months.

{¶25} S.S. was aware of C.C.S.'s concerns about leaving R.B. and Ch.S. at the house because of Elam, so she instructed the girls to stay where their aunt could see them. The girls enjoyed visiting the family, and S.S. was aware that Elam often gave them candy.

{¶26} S.S. first learned of her daughters' sexual behaviors in December 2013 when contacted by sisters T.B. and C.C.S. C.C.S. accompanied S.S. and her daughters to the police station to make the report, and also to the hospital examination; however, the police met with them separately. S.S. and C.C.S. did not tell the girls what to say, only to tell the truth about everything that happened.

{¶27} S.S. never observed any reluctance by her daughters to interact with Elam, but she did notice that R.B. became unusually quiet around him. Prior to this situation, S.S. had no reason to be upset or angry with Elam.

{¶28} Heather Lamfranchi ("Lamfranchi"), a social worker at Akron's Children's Hospital, testified over defense objections to what she was told by R.B. and Ch.S. The trial court accepted the state's position that the evidence was admissible for purposes of the medical diagnosis and treatment.

{¶29} Lamfranchi said R.B. told her about the 2008 bedroom incident, correctly identified body parts on a diagram, and said that Elam would have her and her cousin watch "nasty" movies. Elam would also kiss her on the lips when he saw her.

Lamfranchi shared the information with the nurse practitioner for purposes of the medical examination. Lamfranchi also had a discussion with Ch.S. who shared her experience of sitting on Elam's lap. Finally, Lamfranchi responded, over objection, to the question of whether children typically lie about sexual abuse. Lamfranchi responded that it rarely occurred.

{¶30} Summit County Children Services social worker, Jennifer Dougherty ("Dougherty"), conducted a home visit and talked separately with R.B., Ch.S., and their mother. Dougherty stated, over defense objection, that "the girls both did make disclosures of sexual abuse, and I found them to be credible in those disclosures."

{¶31} Kay Smith ("Smith"), the sister of Grandmother and Elam's first cousin, testified that Elam was very helpful to the family and loyally assisted with caring for Smith's sick mother Anna at her home until she died in 2009. Elam also assists with maintenance of the houses that Smith inherited from her mother, including the home on East 110th.

{¶32} Sharon Ross ("Ross"), a first cousin to Smith, Grandmother, and Elam, frequently visited the house on East 110th where she observed S.S. visit with daughters R.B. and Ch.S. during the 2008 time frame. Ross maintained that S.S. often left R.B. and Ch.S. with Elam for babysitting, sometimes overnight, and occasionally brought the children over to Ross's for meals. Ross attended family gatherings where Elam always hugged and played with the boys and girls. Ross did not see Elam engage in any unusual activity with the children, but she did observe him drinking around them.

**{¶33}** The defense concluded with the testimony of Elam's cousin, Carolyn Elam ("Carolyn"), who is a year or two younger than Elam. Carolyn operated a home-based child care and began providing services to R.B., Ch.S., and their younger brothers, around 2007. S.S. dropped the children off on Sunday evening, and they remained with Carolyn until S.S. picked them up on Friday night. This arrangement continued until R.B. and Ch.S. began attending school. Elam did not visit Carolyn's home when she was caring for R.B. and Ch.S., and she never observed any stress in Elam's relationship with the children on other occasions.

**{¶34}** On September 5, 2014, Carolyn moved into the house where her late aunt Anna, mother of Grandmother, previously resided and where Elam was then residing. Shortly after Carolyn moved in, S.S. arrived at the house with her four children and asked if Carolyn would keep the children while she ran errands. Elam was not there at the time, and according to Carolyn, S.S. did not know that Carolyn lived there. Carolyn concluded that S.S. brought the children so that Elam could babysit. S.S. left the children with Carolyn, and when Elam returned, Carolyn did not observe any fear on the part of the children.

## III.   ASSIGNMENTS OF ERROR

**{¶35}** Elam presents four assignments of error:

I.      The State failed to present sufficient evidence to sustain a conviction against Appellant.

II.      Appellant's convictions are against the manifest weight of the evidence.

III.    Appellant was denied a fair trial by the witness' improper comments while testifying.

IV.    Appellant was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments of the U.S. Constitution.

## IV.    LAW AND ANALYSIS

### A.    Weight and Sufficiency of the Evidence.

{¶36}    We combine the first and second assignments of error for purposes of efficiency, challenging the sufficiency, and manifest weight of the evidence.

#### 1.    Standard of Review

{¶37}    The Ohio Supreme Court has explained that, "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. An appellate court, "may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence." *Thompkins* at 387.

#### a.    Sufficiency of the Evidence

{¶38} The question of "whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). *Thompkins* at 386. It is, "an inquiry about due process, * * * the resolution of which does not allow the court to weigh the evidence." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶39} In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387.

> "[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus , following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 271, 61 L.Ed.2d 560.

*State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386.

### b. Weight of the Evidence

{¶40} After consideration of whether the evidence is sufficient as a matter of law, a manifest weight inquiry looks at whether the evidence was substantial enough for a jury to reasonably conclude that all of the elements of the alleged crime have been proved beyond a reasonable doubt. We sit "as a 'thirteenth juror.'" *Thompkins* at 387, quoting *Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). We review the

entire record, consider the credibility of the witnesses, weigh the evidence and all reasonable inferences, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Martin* at 175*; Leonard* at 68.

{¶41} Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.

> "It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) Black's [Law Dictionary] 1594 [6 Ed.1990]

*Thompkins* at 387.

### 2. Discussion

### A. C.C.S.

{¶42} C.C.S. was 15 years of age at the time of the 1997 incident. Elam was found guilty of gross sexual imposition pursuant to R.C. 2907.05(A)(1):

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> (1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

{¶43} Elam's recitation of C.C.S.'s testimony, in support of the argument that

the conviction is not supported by the evidence, is that C.C.S. was sleeping on a chaise lounge, awakened, startled, with her t-shirt pulled up and bra exposed, with Elam licking her belly button right above her pubic area. The testimony of J.S. confirms, in detail, C.C.S.'s testimony regarding the events of the night and Elam's behavior.

**{¶44}** Elam argues that this testimony does not support the element of force or threat of force required to establish gross sexual imposition. However, "[t]his court has held that the manipulation of a sleeping victim's clothing in order to facilitate sexual conduct constitutes force under R.C. 2901.01(A)(1) even though such force requires only minimal physical exertion." *State v. Walker*, 8th Dist. Cuyahoga No. 96662, 2011-Ohio-6645, ¶ 20. This court has also held that "[s]exual contact, an element of gross sexual imposition, means any nonconsensual physical touching, even through clothing, of the body of another. *State v. Ackley,* 120 Ohio Misc.2d 60, 2002-Ohio-6002, 778 N.E.2d 676." *State v. Jones*, 8th Dist. Cuyahoga No. 87411, 2006-Ohio-5249, ¶ 15.

**{¶45}** Thus, we find Elam's contention on the issue of sufficiency and manifest weight to be without merit. The first and second assignments of error are overruled as to C.C.S.

### b. R.B.

**{¶46}** The convictions relating to R.B. are for gross sexual imposition (R.C. 2907.05(A)(4)) and kidnapping (R.C. 2905.01(A)(4)) with a sexual motivation specification (R.C. 2941.147):

2907.05    Gross sexual imposition.

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

* * *

(4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.

R.C. 2905.01(A)(4) Kidnapping.

(A) No person, in the case of a victim under the age of thirteen, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

R.C. 2941.147 Specification of sexual motivation:

(A)   Whenever a person is charged with an offense that is a violation of section 2903.01, 2903.02, 2903.11, or 2905.01 of the Revised Code, a violation of division (A) of section 2903.04 of the Revised Code, an attempt to violate or complicity in violating section 2903.01, 2903.02, 2903.11, or 2905.01 of the Revised Code when the attempt or complicity is a felony, or an attempt to violate or complicity in violating division (A) of section 2903.04 of the Revised Code when the attempt or complicity is a felony, the

indictment, count in the indictment, information, or complaint charging the offense may include a specification that the person committed the offense with a sexual motivation. * * *

(B)  As used in this section, "sexual motivation" has the same meaning as in section 2971.01 of the Revised Code.

**{¶47}**  R.B. was ten years of age at the time of the occurrence.  She was asleep while he performed cunnilingus, and he grabbed her arm when she awakened and got up to leave, telling her not to tell anyone.  Elam offers again that the evidence is lacking to support these convictions, that there is no evidence that Elam removed R.B. from any place, and no evidence that he restrained R.B. to engage in sexual activity.  In fact, Elam argues that the "grabbing" of the arm occurs after any sexual act, so there can be no restraint for purposes of sexual activity. Further, the grabbing is not sufficient to qualify as a restraint of R.B.'s liberty.

**{¶48}**  As to the length and manner of the restraint, this court has opined:

> Ohio law is clear that "[a]n offense under R.C. 2905.01 does not depend on the manner in which an individual is restrained. * * *  Rather, it depends on whether the restraint 'is such as to place the victim in the offender's power and beyond immediate help, even though temporarily.' * * *  The restraint 'need not be actual confinement, but may be merely compelling the victim to stay where he is.'" *State v. Mosley*, 178 Ohio App.3d 631, 2008-Ohio-5483, 899 N.E.2d 1021, citing *State v. Wilson*, 10th Dist. Franklin No. 99AP-1259, 2000 Ohio App. LEXIS 5057 (Nov. 2, 2000).

*State v. Wright*, 8th Dist. Cuyahoga No. 92344, 2009-Ohio-5229, ¶ 24.

**{¶49}**  A sexual motivation specification "requires that the state show that the underlying offense was committed with 'a purpose to gratify the sexual needs or desires of the offender.'" *State v. Dove*, 8th Dist. Cuyahoga No. 101809, 2015-Ohio-2761, ¶ 38,

quoting R.C. 2941.147. In this case, the underlying offense is kidnapping and the question is whether, after the sexual conduct took place, Elam's brief holding of the victim's arm to restrain her departure while telling her not to tell anyone what happened, and a few other words she could not recall, constitutes a restraint of liberty "for the purpose of" engaging in sexual activity against the victim's will. We find that it does.

{¶50} "R.C. 2905.01(A)(4) requires only that the restraint or removal occur for the purpose of nonconsensual sexual activity." *State v. Davis,* 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 196; *Dove* at ¶ 37. "[T]he kidnapping statute punishes certain removal or restraint *done with a certain purpose*." (Emphasis added.) *State v. Cope,* 12th Dist. Butler No. CA2009-11-285, 2010-Ohio-6430, ¶ 68. R.C. 2941.147, the sexual motivation specification, requires that the state show that the underlying offense was committed with "a purpose to gratify the sexual needs or desires of the offender." R.C. 2971.01(J). *State v. Price*, 8th Dist. Cuyahoga No. 99058, 2013-Ohio-3912, ¶ 43.

{¶51} R.B. testified that she, "got up * * * as soon as she woke up," tried to leave and go downstairs, and Elam grabbed her arm and said, "something, don't tell and some other words that I don't remember." R.B. did not tell anyone what happened because she "was embarrassed."

{¶52} As summarized by the state:

[O]nce [R.B.] woke up to [Elam] licking her, she got out of the bed, was trying to get out of the room, and that's when the defendant stopped her, grabbed her arm and told her specifically not to tell anyone, and within that time frame of him grabbing the arm and telling her not to tell anyone, that was when her liberty was restrained meeting the elements for kidnapping.

**{¶53}** The trial court stated it was focused solely on the grabbing of the arm in deliberating the kidnapping charge and its construction of R.B.'s testimony was that R.B. was:

[W]aking up, making a movement and immediately being grabbed. And this is all taking place in a matter of just seconds, so I just don't think that under Ohio law the Defendant can nicely parse, first I was engaging in sexual activity, then my victim make it stopped because she moved, then I grabbed an arm; but now that grabbing of the arm wasn't for the purpose of sexual activity, it was for the purpose of having her listen to what I'm about to tell her.

(Tr. 726.)

**{¶54}** The trial court further explained:

I mean, I just don't think we can parse this stuff happening, because, let's face it, if he had grabbed her arm and she would have responded by simply going limp and laying back down again, okay, then we would be interpreting that grab for the purpose of sexual activity, wouldn't we?

But the fact that he decided to end it once she moved, I'm sorry, I just don't think we can cut the baby in that — parse that up when things are happening second by second. * * *

But, let's face it let's take another case. Let's say she wakes up, he's engaging in sexual activity, she gets up and runs out of the room. If that was the evidence, could you sustain a kidnapping? There's no grabbing of the arm. He found his victim in the bedroom sleeping, he did what he did, the minute she decided to get up and leave, he let her get up and leave. There would be no kidnaping.

(Tr. 726 and 727.)  *See*, *e.g.*, *In re A.K.*, 8th Dist. Cuyahoga No. 97188, 2012-Ohio-1767, where the appellant refused to allow the victim to leave the room after the act.

{¶55}    We cannot say that the trier of fact in this case truly lost its way based on our review of the entire record.    Therefore, we do not find that the trial court's assessment was an abuse of discretion and was not supported by the sufficiency or weight of the evidence.    "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."    *State v. Adams*, 2d Dist. Greene Nos. 2013 CA 61 and 2013 CA 62, 2014-Ohio-3432, ¶ 24.

{¶56}    Appellant's first and second assignments of error as they relate to R.B. are overruled. The trial court's findings are affirmed.

### B.    Improper Comments by Witness

#### 1.    Standard of Review

{¶57}    We have held that:

The admission or exclusion of evidence rests within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. A trial court has broad discretion to determine the admissibility of lay witness opinion testimony. Accordingly, a reviewing court will not disturb a trial court's determination on the admissibility of lay witness opinion testimony absent an abuse of discretion. An abuse of discretion connotes more than an error in law or judgment; it suggests that a decision is unreasonable, arbitrary, or unconscionable.

*State v. Allen*, 8th Dist. Cuyahoga No. 92482, 2010-Ohio-9, ¶ 46.

#### 2.    Discussion

{¶58} Elam argues here that two witnesses made improper comments depriving Elam of a fair trial. First, the testimony by Lamfranchi, the Akron Children's Hospital Emergency Department social worker that, in her experience, children "vary rarely" lie about sexual abuse. The second witness was Dougherty, the Intake Social Worker for Summit County Children Services who, when asked why she indicated sexual abuse in the case disposition, replied, "the girls both did make disclosures of sexual abuse, and I found them to be credible in those disclosures."

{¶59} Generally, expert witnesses may not testify regarding the truth of statements made by a child declarant, nor may a lay person testify as to the truthfulness of another witness. *Allen* at ¶ 48-49, citing *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989); and *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31. The question is whether the errors were harmless:

> Pursuant to Crim.R. 52(A), "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In order to find an error harmless, a reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. *State v. Lytle* (1976), 48 Ohio St.2d 391, 403, 358 N.E.2d 623. A reviewing court may overlook an error where the admissible evidence comprises "overwhelming" proof of a defendant's guilt. *State v. Williams* (1983), 6 Ohio St.3d 281, 290, 6 Ohio B. 345, 452 N.E.2d 1323. "Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." *State v. Brown*, 65 Ohio St.3d 483, 485, 1992 Ohio 61, 605 N.E.2d 46;

*Allen* at ¶ 51.

{¶60} R.B. testified about Elam's sexual activities and was able to recount details about the day that the incident occurred such as what was on television when she

went upstairs to Elam's residence in the two family home. She remembered that she had candy that day and later fell asleep, and also recalled that Elam had a lot of beer cans and "he was drinking a lot at the table."

**{¶61}** R.B. testified that she awakened to Elam licking her "private part" in the front and that she was referring to her vagina. R.B. looked at Elam when she awakened, and at first, "he was just — he was still doing it." It was also the testimony of R.B. that what she noticed about Elam's face at that moment was that his eyes were red. R.B. described how she was related to Elam, various family events, and who she ultimately told about the incident.

**{¶62}** This court finds that Elam was not prejudiced by the admission of the statements of the social workers. The trial judge, as the trier of fact in the bench trial, "was able to perceive [R.B.'s] credibility and decide for" himself whether R.B. was being truthful. *See Allen*, 8th Dist. Cuyahoga No. 92482, 2010-Ohio-9 at ¶ 52, citing *State v. Burchett*, 12th Dist. Preble Nos. CA2003-09-017 and CA2003-09-018, 2004-Ohio-4983, ¶ 20, citing *State v. Proffitt*, 72 Ohio App.3d 807, 596 N.E.2d 527 (12th Dist.1991).

**{¶63}** The trial judge was able to listen to and observe the witnesses. Based on the totality of the circumstances, the trial court formed an opinion as to the truthfulness of the testimony in this case. Thus, we find that any error relating to the statement by Lamfranchi was harmless. The third assignment of error is overruled.

### C. Ineffective Assistance of Counsel

#### 1. Standard of Review

**{¶64}** An appellant must show, in order to substantiate a claim of ineffective assistance of counsel, that: (1) "counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial." *State v. Trimble*, 122 Ohio St.3d 297, 310, 2009-Ohio-2961, 911 N.E.2d 242, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. "Judicial scrutiny of defense counsel's performance must be highly deferential." *Strickland* at ¶ 15. In Ohio, there is a presumption that a properly licensed attorney is competent. *State v. Calhoun*, 86 Ohio St.3d 279, 1999-Ohio-102, 714 N.E.2d 905.

#### 2. Discussion

**{¶65}** The fourth assignment of error posits that Elam's trial counsel was ineffective for failure to move to bifurcate the cases of R.B. and C.C.S. In order to prevail here, Elam must show by a reasonable probability that he was prejudiced and that, but for counsel's errors, the outcome of the trial would be different. *In re A.K.,* 8th Dist. Cuyahoga No. 97188, 2012-Ohio-1767, at ¶ 24. "Further, counsel's performance is evaluated in light of an attorney's discretion to develop appropriate trial strategies according to the attorney's independent judgment, given the facts of the case, at least some of which may not be reflected in the trial record." *State v. James*, 8th Dist. Cuyahoga No. 102604, 2015-Ohio-4987, ¶ 4.

**{¶66}** Where the requirements of Crim.R. 8(A) are satisfied, the law favors joining multiple offenses in a single trial. *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2014-Ohio-4377, ¶ 38. However, a trial court may grant severance if it appears the defendant would be prejudiced by the joinder. Crim.R. 14; *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 95. Further:

> "A trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder,* 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33, citing *State v. Torres*, 66 Ohio St.2d 340, 343-344, 421 N.E.2d 1288 (1981).
>
> Joinder is therefore not prejudicial when the evidence is direct and uncomplicated and can reasonably be separated as to each offense. *Id.*

*State v. Sutton*, 8th Dist. Cuyahoga Nos. 102300 and 102302, 2015-Ohio-4074, ¶ 22.

**{¶67}** We find that, in this case, the evidence was direct, uncomplicated and can reasonably be separated as to each offense. The trial court issued a finding of guilt on three of the nine counts. Three identified victims were involved; however, the counts upon which guilt was determined involved only two of the victims. The testimony by those two victims, R.B. and C.C.S., was clear and detailed. Each victim was able to recount the incidents with clarity. In the case of C.C.S. and the 1997 incident, J.S. provided an eyewitness description of the sexual encounter from his view point of only seven- to eight- feet away.

**{¶68}** As the state points out, the joinder of the trials also allowed defense

counsel to argue that C.C.S. influenced the testimony of R.B. and that R.B.'s recitation of facts should be viewed with that in mind. Defense counsel was presumptively competent in determining that joinder was in the best interests of his client. *State v. James, supra.*

{¶69} "In fact, the [trial court's] not guilty verdicts on several of the charges demonstrated the [trial court's] ability to apply the evidence separately to each offense." *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 69. We conclude that joinder was not prejudicial; therefore, Elam is unable to demonstrate deficiency and prejudice under *Strickland.*

{¶70} Appellant's fourth assignment of error is overruled.

## V. CONCLUSION

{¶71} The trial court's order in this case is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

LARRY A. JONES, SR., A.J., CONCURS;
TIM McCORMACK, J., CONCURS IN JUDGMENT ONLY